*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 16-FS-945 & 16-FS-946

IN RE PETITION OF J.O. & P.O., APPELLANTS.

Appeals from the Superior Court of the
District of Columbia
(ADA-95-13)

(Hon. Errol R. Arthur, Magistrate Judge)
(Hon. Hiram E. Puig-Lugo, Associate Judge)

(Argued June 14, 2017                         Decided December 12, 2017)

*Patricia M. Spicer,* for appellants.

*Mindy Leon*, guardian *ad litem*.

*Melissa Colangelo*, Children's Law Center, as *amicus curiae*.

*Sharon A. Singh,* for appellees.

*Karl A. Racine*, Attorney General for the District of Columbia, with whom *Todd S. Kim*, Solicitor General at the time, *Loren L. AliKhan*, Deputy Solicitor General at the time, and *Rhondalyn Primes Okoroma*, Assistant Attorney General, filed a statement in lieu of brief, for appellee the District of Columbia.

Before BLACKBURNE-RIGSBY, *Chief Judge*, GLICKMAN, *Associate Judge*, and REID, *Senior Judge*.

Opinion for the court by *Chief Judge* BLACKBURNE-RIGSBY.

Concurring opinion by *Associate Judge* GLICKMAN at page 44.

BLACKBURNE-RIGSBY, *Chief Judge*: This case involves two competing petitions to adopt E.S., a little girl born prematurely to K.S. on October 30, 2012, and adjudicated neglected on February 27, 2013. E.S.'s foster parents, appellants J.O. and P.O. ("the O.s"), and E.S.'s guardian *ad litem* ("GAL"), challenge the trial court's decision dismissing the O.s' adoption petition, and granting the petition of B.S.W. and S.E.W. ("the W.s").

On appeal, the O.s argue that weighty consideration should not have been afforded to the W.s because K.S. was incompetent at the time she designated the W.s. Without the weighty consideration, the O.s argue, the trial court would not have found that granting the W.s' petition was in the best interest of the child, E.S.

Under existing case law, when a parent consents to adoption of his or her child by a preferred custodian, "unless it is established that the parent is not *competent* to make such a decision . . . a parent's choice of a fit custodian for the child must be given weighty consideration . . . ." *In re T.J.*, 666 A.2d 1, 11 (D.C. 1995) (emphasis added). In this case, we must clarify the standard for determining whether a natural parent is competent to designate a preferred caregiver, and thus recognize those instances when a natural parent's choice of preferred caregiver is not entitled to weighty consideration because the parent is not competent to make

such a decision. Based on the record before us, we conclude that the natural parent, K.S., was not competent to designate a preferred caregiver because she could not make a determination about what was in her child's best interest and plan for her child's future accordingly. The trial court therefore erred in concluding that K.S.'s designation of the W.s should be afforded weighty consideration. Because the trial court erred in assessing the W.s under the weighty consideration doctrine, we remand to the trial court to reevaluate the O.s' and the W.s' adoption petitions based solely on the best interest of the minor child under the termination of parental rights ("TPR") factors under D.C. Code § 16-2353 (2012 Repl.).[1]

---

[1] As K.S. has passed away, we cannot remand this case back to the trial court for K.S. to testify as to her competency. We also do not consider the O.s' argument that the trial court erred in denying Mr. Nair's motion to withdraw as K.S.'s attorney, because the issue is now moot. *See Crawford v. First Washington Ins. Co.*, 121 A.3d 37, 39 (D.C. 2015) (holding that "[w]hen there is no possibility of collateral legal consequences for appellant flowing from the determination on appeal, mootness is controlling") (citation, ellipses, and internal quotation marks omitted); *Rales v. Rales*, 908 A.2d 64, 70 (D.C. 2006) ("[N]o relief which this court could grant . . . would make a substantive difference in the outcome of the case.").

## I. Factual Background

### A. E.S.'s Placement in Foster Care and Permanency Goals Set for Her Case

E.S. was born prematurely at Georgetown University Medical Center on October 30, 2012.[2] On the day of her birth, her biological mother, K.S., who had a history of mental health problems, was admitted to in-patient psychiatric care at the hospital, where she remained hospitalized until December 13, 2012. The hospital contacted the Child and Family Services Agency ("CFSA"), and social worker Sarah McDonald was assigned to E.S.'s case. However, K.S.'s treating psychiatrist, Dr. Thomas Cummings, Jr., prevented access to K.S. by CFSA social workers and K.S.'s attorney because of K.S.'s inability to make legal decisions. On November 16, 2012, E.S. was discharged from the hospital and into the temporary care of the O.s, who were licensed pre-adoptive foster parents.

---

[2] The identity of E.S.'s biological father is unknown. The trial court therefore waived his consent pursuant to D.C. Code § 16-304 (d) (2012 Repl.), which stipulates that where a parent whose consent is required "cannot be located . . . the consent of that parent is not required."

On November 18, 2012, CFSA held a Family Team Meeting ("FTM")[3] to develop a case plan for E.S. Because K.S. remained hospitalized, she could not participate in the meeting. However, E.S.'s maternal grandmother (D.W.), maternal aunt (J.E.), maternal uncle (E.W.), and E.S.'s GAL, Mindy Leon, attended the meeting along with B.S.W. and S.E.W. ("the W.s"), who were not biologically related to K.S. but had been identified by D.W. as potential adoptive parents for E.S.[4] Social worker Sarah McDonald and supervising social worker Eleanor Sanders also attended the meeting.

At the meeting, Ms. Sanders asked E.S.'s family members if they were willing to have E.S. placed with them temporarily or if they were interested in adopting E.S., and none of the family members were willing or able to do so. The W.s, however, expressed their interest in adopting E.S. The W.s, who resided in Virginia, were not licensed foster parents, so they agreed to begin the licensing

---

[3] Family Team Meetings are "family group decision-making meetings for children in the child welfare system[ ] that . . . enable families to make decisions and develop plans that nurture children and protect them from abuse and neglect[.]" 42 U.S.C. § 627 (a)(3)(A) (2010); D.C. Code § 16-2312 (a-1)(1) (2012 Repl.) (Family Team Meetings in the District "solicit the input of family members, relatives, and others concerned with the welfare of the child to develop a safety plan approved by the Agency.").

[4] Ms. W. is the daughter of a woman D.W. knew from church.

process, which was expected to take about four months. The result of the meeting was a goal for potential reunification with K.S., and alternatively, adoption by the W.s.

On November 19, 2012, CFSA filed a neglect petition with the Family Court Division of the Superior Court, which entered an order formally placing E.S. in temporary foster care with the O.s. Social worker Ms. McDonald then attempted to schedule visits between K.S., E.S., and both of the potential adoptive families, the O.s and the W.s. On January 22, 2013, K.S. was taken to meet the W.s at CFSA; K.S.'s mother, D.W., was also present at this meeting. This was also around the time that court authorized visitation between E.S. and the W.s began. Ms. McDonald supervised the visit, and during the visit, K.S. told Ms. McDonald that the W.s might be a good fit for E.S. At this visit, K.S. appeared anxious and fidgety, and had blood stains in and around her ears, which she admitted were a result of self-injury. K.S. cancelled her January 8, 2013 visit that was planned with the O.s as well as the December 31, 2012 and February 5, 2013 visits scheduled with E.S. Although Ms. McDonald attempted to schedule other dates, K.S. "wasn't sure that she wanted to do that."

On February 27, 2013, E.S. was adjudicated neglected under D.C. Code § 16-2301 (9)(A)(ii) and (iii) (2012 Repl.),[5] and the trial court committed E.S. to agency care for a period not to exceed two years. The trial court set concurrent permanency goals for both reunification with K.S. and for adoption. The trial court noted that K.S. had a long medical and mental health history. K.S. suffered a traumatic brain injury at age nineteen. She had a history of substance abuse, mood symptoms, attention deficient disorder, and had previously been hospitalized on at least two occasions for psychiatric reasons. Dr. Cummings diagnosed K.S. with mood disorder, not otherwise specified, and psychosis, not otherwise specified, and stated that K.S. continues to require inpatient psychiatric hospitalization. The trial court therefore determined that K.S. was "unable to discharge her responsibility to and for the child due to her hospitalization, mental incapacity, and lack of

---

[5] The term "neglected child" means a child:

. . .

(ii) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or custodian; [or] (iii) whose parent, guardian, or custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity[.]

compliance with mental health treatment."  Additionally, K.S. had little to no contact with E.S. since her discharge, and had not made any efforts to inquire about E.S.'s well-being, or provide any information about possible placement resources for E.S.  The trial court also noted that K.S. had not made any "efforts to have someone else care" for E.S. during the time she was hospitalized, and that E.S. was "without proper parental care or control."

### B.  Petitions for E.S.'s Adoption

On May 2, 2013 when E.S. was seven months old, the O.s filed a petition to adopt E.S.  In that same month, on May 29, 2013, the W.s filed a petition to adopt E.S.  K.S. was served with both adoption petitions in September 2013, while she was living in New York.  Meanwhile, E.S.'s visitation with the W.s increased.  On June 5, 2013, the trial court approved of unsupervised visits with the W.s, and on June 28th, the court authorized overnight visitation.  In early July 2013, E.S. began weekend overnight visits with the W.s.

In August 2013, the W.s obtained their license as foster parents in Virginia. Prior to the W.s being approved, social worker Amy Costello conducted a child-

specific kinship home study.[6] Ms. Costello testified about the many concerns she had regarding placing E.S. with the W. family, who already had four boys with various mental health needs and learning disabilities. Ms. Costello also had concerns about S.E.W.'s anxiety levels and the fact that she "was a little needy with this baby and how much she wanted to care for the baby . . . almost like getting her own needs met through this, this baby . . . ." After Ms. Costello raised her concerns with her supervisor, she was told "there was a strong raising of the fact that the family was kin." Ms. Costello then approved the home study with the understanding that there would be safeguards in place to mitigate her concerns. She testified that she would not have approved the home study had the W. family not been identified as kin.[7]

---

[6] CFSA identified E.S. as kin to the W. family, even though E.S. was not biologically related to them and they were not godparents to E.S. The CFSA supervisory social worker, Ms. Sanders, testified that there must be a biological connection or an affidavit from a parent stating the person seeking kinship status was a godparent or had a significant connection to the child prior to the child entering foster care.

[7] After giving testimony on June 2, 2014, Ms. Costello became aware of complaints, within her agency, being made about her testimony. Ms. Costello testified about these complaints, as well as her subsequent termination on June 4, 2014. Prior to being terminated, Ms. Costello had worked at her agency for five and a half years.

Thereafter, in a letter dated August 21, 2013, CFSA notified the O.s of its intent to change E.S.'s placement to the W.s' residence. On August 27, 2013, the O.s and the GAL requested a Fair Hearing to challenge and stay CFSA's change in placement. The Fair Hearing took place over the course of six days between September 27, 2013 and January 17, 2014. On March 7, 2014, the Fair Hearing examiner ruled in favor of the O.s and GAL, finding that CFSA had failed to show by a preponderance of evidence that removal was in E.S.'s best interest. However, overnight visits between E.S. and the W.s continued.

**C. K.S.'s Consent to Adoption by the W.s.**

Prior to the Fair Hearing, Kathleen Ambroso, the newly assigned social worker from March to October 2013, arranged with one of K.S.'s friends, Mr. Coefed, for K.S. to be brought to CFSA from New York to attend the hearing in order to "involve [K.S.] in the case." Ms. Ambroso also testified that her "understanding of the fair hearing was about placement to determine whether E.S. would be placed with the W.s."

On September 27, 2013, the first day of the hearing, K.S. met with Ms. Ambroso, and Zachary Schaeffer, the shadowing social worker slated to take over

K.S.'s case, at the CFSA offices. Ms. Ambroso discussed E.S.'s living arrangement with K.S. and talked about the two families who were seeking to adopt E.S; she used simplified legal vocabulary in her explanations to K.S and "just gave her an over-arching status of the case and the fact that there were two parties involved and the status of the petitions were being discussed in court." Initially, K.S. exhibited confusion about which family E.S. was residing with, and indicated to Ms. Ambroso that she believed her daughter was residing with the W.s.[8] Ms. Ambroso clarified that E.S. was currently living with the O.s and was having visits with the W.s. She showed K.S. photos of the W.s from the January 22, 2013 visit in an attempt to explain the situation.

Ms. Ambroso also simplified the current living arrangement in her explanation to K.S. in an effort to communicate the amount of time E.S. was spending with each family, explaining that E.S. spends her weeks with the O.s and her weekends with the W.s, even though this was not the exact schedule. She did not explain how long this arrangement had been in place, even though overnight visits of two nights every other week with the W.s had begun recently in July of

---

[8] Ms. Ambroso testified, "She's [K.S.] confusing the W.'s and the O.'s and which name went with which party."

2013. Ms. Ambroso then asked K.S. if she wanted to meet with the potential adoptive families, and helped K.S. develop questions for the families.

K.S. met with the O.s and S.E.W.[9] for about fifteen minutes each at CFSA.[10] During her meeting with the O.s, E.S. was sleeping. After meeting with the O.s and S.E.W., K.S. told Ms. Ambroso that she wanted additional time to make a decision.[11] Ms. Ambroso then told K.S. not to feel pressured and that she could not make a wrong decision. K.S. again exhibited confusion about where her daughter was residing, stating that she wanted her daughter to be adopted by the W.s because she was living with them longer.[12] Ms. Ambroso clarified the living situation again, explaining the percentage of time E.S. spent with both families, and that she was living with the O.s. K.S. then told Ms. Ambroso that she wanted

---

[9] B.S.W. was not present.

[10] Ms. Ambroso suggested this amount of time because she did not want to overwhelm K.S. and because this "was in line with our time restrictions for that day," as "Mr. Nair [K.S.'s attorney] had to leave by a certain time." Mr. Nair was not present during these meetings as K.S. said he made her "uncomfortable and nervous."

[11] During the day, K.S. also took three walks outside to calm herself down.

[12] S.E.W. testified that, on the morning of the Fair Hearing, K.S. told her that she came to sign after learning that E.S. was not living with the W.s and that "it would take a lot for her to change her mind" from them. However, Ms. Ambroso was with K.S. the entire day and testified that K.S. did not say this.

E.S. to continue visiting with both families and that she needed more time to make a decision on which family to choose for adoption. Ms. Ambroso explained that the "current visitation schedule was not an appropriate, long-term solution" and that it "was not an option to just continue visiting with both families." She told K.S. that if she did not consent, the decision about E.S.'s permanent placement would be made in court.

Ms. Ambroso then spoke with K.S.'s attorney, Madhavan Nair, at which time K.S. told Mr. Nair that she did not want to consent that day. Mr. Nair reiterated what Ms. Ambroso "had said about the upcoming court hearings and the importance of her being involved in the case." Ms. Ambroso also asked Mr. Nair to explain the different court hearings to K.S., after which Ms. Ambroso again reiterated her statement about E.S.'s permanent placement being decided in court. Ms. Ambroso's testimony at this point was a bit unclear—she stated that K.S. told her that "she didn't want to consent today, that she —." When prompted to complete her thought, Ms. Ambroso added, "—wanted to be the one to make the decision on E.S.'s permanency" and "wanted to consent to the W.'s."

At this point, Ms. Ambroso left the conversation, testifying that "consent was a matter between her [K.S.] and her attorney."[13] Ms. Ambroso subsequently took Mr. Nair and K.S. to the CFSA notary, where K.S. signed a written statement of consent, which was notarized that same day and filed for the adoption case.[14]

On October 18, 2013, the trial court changed the permanency goal for E.S. from reunification to adoption. That same day, the O.s and GAL filed a motion

---

[13] We note that Ms. Ambroso's testimony contains apparent contradictions. After her recollection was refreshed with her September 27, 2013 contact notes, Ms. Ambroso testified that K.S. had stated that she liked the W.s' personalities, but that she wanted more time to make her decision. However, Ms. Ambroso also testified that "when we asked [K.S.] specifically about why she's consenting to the W.'s, she said she liked their personality and I think she said upbringing, like the way they ran their home." This contradicts Ms. Ambroso's assertion that she left the conversation immediately after K.S. "said she wanted to consent to the W.s" because "consent was a matter between [K.S.] and her attorney." It also contradicts Mr. Schaeffer's testimony that Ms. Ambroso did not speak with K.S. about her consent.

[14] The September 27, 2013 consent agreement states:

> consent to the legal adoption of my child by the Petitioners B.S.W. and S.E.W., being fully aware that in the event the Petition is granted by this Court, the minor child's name will be changed to that of the Petitioner(s). I do request for the best interest of my minor child that the Petition be granted and that a Decree be entered legalizing the adoption of the minor child by the Petitioners.

seeking to have K.S.'s consent excluded, claiming that K.S. lacked mental capacity to give consent as shown by her "bizarre behavior"[15] on the day she consented. The motion also asserted that K.S. was not fully informed and was coerced by third parties into giving consent. On November 15, 2013, the trial court denied the motion to exclude K.S.'s consent.

## D. K.S.'s Attempts to Withdraw Her Consent to Adoption by the W.s

In early November, K.S. contacted her sister J.E as K.S. was coming into town. During this conversation, K.S. told J.E. that she had given custody to the family with four boys that had E.S. since birth. J.E. then went to pick up K.S., who wanted to get a present for E.S. in addition to new earplugs, a new headband to cover her ears, and an X-ACTO knife, which J.E. did not allow her to purchase.[16] After picking out a present for E.S., J.E. took K.S. to visit with E.S. at the O.s'

---

[15] The motion alleged that during the Fair Hearing, K.S. "came to the glass window of the conference room and appeared visibly upset and agitated as she asked why her mother was testifying in this matter." The supplement to the motion also alleged that K.S. did not pass the initial security screening upon entry to CFSA on September 27, 2013, because she was carrying an X-ACTO knife on her person.

[16] K.S. exhibited a pattern of self-injurious and delusional behavior focused on her ears. K.S. told J.E. that "she's pregnant because she hasn't been cutting her ears."

home. On the drive over to the O.s' home, J.E. explained to K.S. that K.S. had signed papers for the W. family, and that this was not the family E.S. had been with since birth. J.E. understood that K.S. was fragile and did not want K.S. to be surprised that E.S. was currently residing with the O.s, who had actually had E.S. since birth.

During the visit with E.S. at the O.s' home, K.S. told the O.s that she did not know that E.S. had been residing with them the entire time. K.S. expressed to her sister, J.E., that it would be traumatic for E.S. to be moved, and that she wanted E.S. to remain where she had lived all along. Following the meeting, on November 11th and November 18th, K.S. left two voicemail messages for her attorney, Mr. Nair, stating that she did not want E.S. to be moved, that she wanted E.S. to stay with the O.s, and that she had met the O.s at their home and liked them. Mr. Nair attempted to contact K.S., but was not able to reach her because she did not leave a valid telephone number.

On November 21, 2013, Mr. Nair filed a praecipe with the trial court detailing the voicemails that he had received from K.S. On November 25th, the O.s and the GAL renewed their motion to revoke K.S.'s consent, arguing that K.S.'s consent was based on a mistake of fact and was involuntary, due to her

mental illness. Attached to their motion was an affidavit from J.E. attesting that K.S. was mistaken about the family with whom E.S. had been living, and that K.S. believed that she had consented to adoption by the family with whom E.S. had been placed since birth.

On December 31, 2013, K.S., through her counsel, filed a motion to revoke or withdraw her consent to the adoption. The motion stated that K.S. had called her attorney on December 26th and informed him directly that she wished to revoke her consent to the adoption. K.S. stated that she had been confused about E.S.'s living arrangement and believed that E.S. had been living with the W.s when she consented to their adoption of E.S.[17]

**E. The Adoption Trial**

The competing petitions for adoption were consolidated and the adoption trial before Magistrate Judge Errol Arthur began on November 21, 2013, and concluded on April 24, 2015. Soon after trial began, on November 26, 2013, the trial court increased E.S.'s visitation with the W.s to overnight visitation every

---

[17] The trial court concluded that it could not assess the reliability of these statements without K.S.'s testimony, and thus, placed little to no weight on them.

other week from Sunday to Wednesday and every other weekend from Thursday to Monday. This visitation arrangement resulted in E.S. spending half of her time with the O.s and half of her time with the W.s.

### 1. Testimony Regarding K.S.'s Mental Health and Her Capacity to Consent

Ms. Ambroso testified that, on September 27, 2013, the first day of the Fair Hearing, K.S. informed her that she was not on medication because she was pregnant.[18] She also testified that K.S.'s friend, Mr. Coefed, had told her that, to his knowledge, K.S. was not on medication or receiving mental health care around the time she came to D.C. on September 27th.

Ms. Ambroso further testified that K.S.'s demeanor on September 27th appeared normal and that she did not notice any memory loss. However, Ms. Ambroso also testified that she was "not sure to what extent she [K.S.] was confused about why people were in the building" for the Fair Hearing.

---

[18] The interim report that Ms. Ambroso filed with the trial court also stated that K.S. had said that she was not receiving psychiatric care or on psychiatric medicine.

Shadowing social worker Mr. Schaefer also testified that K.S. was lucid and "oriented to person, place, and time." However, Mr. Schaefer stated that he did not hear K.S. state that she wanted to consent to the W. family or make any statement regarding E.S.'s placement. He further stated that he was relying on the signed consent filed with the court.

On November 22, 2013, K.S.'s sister, J.E., testified extensively about her sister's past and present mental health issues. J.E. also testified that K.S. would wander about in New York, D.C., and Virginia, mentally ill and frequently homeless and that she would go long periods of time without any ability to contact her sister. J.E. testified that she had taken care of K.S. for most of her life and had been the point of contact for K.S.'s hospitalizations when K.S. was in her twenties and thirties.

J.E. further stated that K.S. exhibited signs of mental illness during their meeting with the O.s in November. She stated that she had to purchase a headband for K.S. because her ears were bleeding, that K.S. appeared "delusional," and made unusual statements to her. J.E. also testified that K.S. had left a voicemail message for her, indicating that she was confused about which family she had consented to adopting E.S. K.S. stated in the voicemail message: "I had signed something, but

I had told him on the thing, I had thought that the whole time, since [E.S.] was, you know taken from me, I thought that she was with the other family . . . Well, no, the whole time she was with the [O.] family . . . ."

Dr. Cummings, K.S.'s treating psychiatrist during her hospitalization at Georgetown, also testified at the adoption trial.[19] Dr. Cummings testified that K.S. was diagnosed with bipolar disorder and was determined to have experienced a manic episode. K.S. was also determined to have a right frontal brain injury and minimal capacity. Her symptoms included agitation, self-injuring to her ears, impaired decision-making, unstable mood, and disorganized thoughts. Dr. Cummings explained that although K.S. had six weeks of extensive treatment and was on medication at the time of her discharge, she could not make complex decisions, had the capacity only to understand that she had an upcoming court hearing regarding her daughter, and would need constant medication to remain psychiatrically stable. He further explained that K.S. had been inconsistent in her decision-making with regard to whether or not she wanted to keep E.S.

---

[19] Dr. Cummings was qualified as an expert in the field of psychiatry.

Dr. Cummings testified that he was concerned about K.S.'s mental capacity to give a knowing and informed consent to E.S.'s adoption without first having a mental capacity evaluation within hours before the consent. He also testified that he would be highly concerned about K.S.'s capacity to consent if (1) she was not receiving psychiatric treatment; (2) she was not taking her medication; (3) she was displaying signs of confusion; and (4) information relevant to her decision had to be simplified for her to understand. Further, he testified that K.S.'s inability to retain information would suggest that she was actively psychotic and not able to make important decisions. After reviewing the facts in this case, including the voicemail K.S. left for her sister, he concluded that K.S. likely did not have the mental capacity to give consent on September 27, 2013.

## 2. Testimony Regarding E.S.'s Relationship with the W.s

At trial, S.E.W. testified that the W. family loved E.S., that E.S. was doing well during her visits with them, and that E.S had a strong relationship with everyone in the W. family, including their four sons. She further testified that on her own, E.S. called S.E.W. "mama" or "mom," and called B.S.W. "dada" or "'Bry-Bry." S.E.W. also testified that the W.s have a large extended family in the area and that the family comes together frequently, and was able to develop a

relationship with E.S.  The W.s had designated S.E.W.'s sister and brother-in-law, whom E.S. saw every week during her visits with the W.s, as guardians in the event that anything happened to the W.s.  In addition, through E.S.'s visits with the W.s, E.S. had also developed a positive relationship with her biological grandmother, D.W.; S.E.W. testified that she intended to continue this relationship as well as E.S.'s relationship with other relatives, if she were allowed to adopt E.S.

Social worker Nicole Morel, who had been assigned to monitor E.S. with the W.s in Virginia, also testified that she visited the W.s' home quarterly, from August 2013 to May 2014, and that once E.S. was moved to the W.s' home, she visited twice a month.  Ms. Morel testified that E.S. was happy and comfortable in the W.s' home, that E.S. developed a bond with the W.s and their sons, and that the W.s appeared loving and caring.  Ms. Morel also testified that E.S. had trouble transitioning after visits with the W.s, and that E.S. would cry when she had to leave S.E.W.  Overall, Ms. Morel testified that she did not have any concerns about the W.s' ability to parent E.S. and testified that she supported their adoption petition.

In addition, three CFSA social workers, Ms. Ambroso, Mr. Shaeffer, and Ms. Sanders all testified that the W.s were good parents, that E.S. had formed a strong bond with S.E.W., and that the W. family met all of E.S.'s needs.

### 3. Testimony Regarding E.S.'s Relationship with the O.s

The O.s testified that E.S. had adjusted to their home and that they had developed child-parent relationships with E.S. CFSA social workers Mr. Shaeffer and Ms. Sanders both testified that the O.s were good parents and that E.S. was doing well in their care. Ms. Sanders described a few problems that the agency experienced initially in trying to get the O.s to cooperate with E.S.'s overnight visitation with the W.s and with their decision not to have direct contact with the W.s in order to make E.S.'s transitions easier.

Ekeoma Eluchie, a social worker with Children's Choice, testified that she had conducted and approved the first home study for the O.s, and that she did not have any concerns about the care the O.s provided for E.S. She also testified that she was aware of P.O.'s prior life experiences—such as an early childhood molestation incident, her previous divorce and her infertility, but that after

discussing those experiences with P.O., she was satisfied that those experiences would not impact P.O.'s parenting.

### 4. The O.s' Expert Testimony

The O.s presented testimony from two psychologists, Dr. Seth King and Dr. Michael Gilliard, regarding E.S.'s relationship with the O.s. Dr. Gilliard testified that he evaluated E.S.'s interactions with the O.s at their home and concluded that E.S. had formed a primary attachment to P.O. and a secondary attachment to J.O. Although Dr. Gilliard had not evaluated E.S. with the W.s, he also opined that E.S. had formed a bond with the W.s, since E.S. continued to thrive, despite the joint custodial arrangement between the O.s and the W.s. Still, Dr. Gilliard recommended that E.S. remain with the O.s since she had formed her first primary attachment with them and had sibling-type relationships with the O.s' sons.

Dr. Seth King, who also conducted an interactive assessment of E.S. and the O.s when E.S. was ten months old, concluded that the O.s were E.S.'s primary attachment figures and opined that E.S. should be placed permanently with the O.s. Although Dr. King did not interview the W.s or evaluate their interactions with E.S., Dr. King reviewed the home study of the W.s, and testified that if E.S. is

moved to a home where multiple family members have attention deficit hyperactivity disorder ("ADHD"), the environment could be chaotic. He further testified that having a child with anxiety and learning disabilities is demanding for the parents. Dr. King testified that remaining with the O.s would be the safest option for E.S. as it would present the least amount of risk for her development, mental health, and stability.

E.S.'s pediatrician, Dr. Marilyn Corder, also testified, amongst other things, that E.S appeared anxious during one of her pediatric appointments, that she exhibited some aggressive and frustrated behaviors, and appeared to be more clingy—the O.s alleged that these symptoms began after E.S. began her overnight visits with the W.s. Dr. Corder later diagnosed E.S. as suffering from separation anxiety; she opined that moving between homes prolonged E.S.'s separation anxiety and was detrimental to E.S.'s growth and development. Dr. Corder recommended that the O.s, who had established a bond with E.S., should remain E.S.'s primary caretakers, and that visits with the W.s should be limited to daytime visits.

### 5. The Trial Court's Ruling and Its Affirmance on Review

On April 24, 2015, the trial court issued oral rulings on the joint motion of the O.s and GAL to exclude K.S.'s consent, K.S.'s motion to revoke her consent, and the competing adoption petitions. The trial court also issued a written order on February 27, 2016. The trial court found, by clear and convincing evidence, that K.S. was not fit to parent E.S. The trial court also denied the motions to revoke K.S.'s consent, concluding that K.S. had expressed unequivocal consent, under oath, to the adoption of E.S. by the W.s, and that she was mentally competent to consent to this adoption on September 27, 2013. In reaching this conclusion, the trial court credited Ms. Ambroso's testimony that she believed K.S. was competent to consent.[20] The trial court also found Dr. Cummings's testimony to be credible. Notably, the trial court stated:

> The Court also agrees with Dr. Cummings's conclusion that any assessment on whether K.S. had the capacity to make decisions, enter contracts, and [in this matter] consent to an adoption would have to involve an assessment of whether she was receiving mental treatment. However, in this matter, no credible evidence was presented to suggest that K.S. was not receiving mental health treatment at the time she executed the consent or deemed mentally committed.

[20] Ms. Ambroso, although aware of K.S.'s complicated psychiatric history and her difficulties in retaining information, stated that she looked at K.S.'s demeanor and presentation in assessing her capacity to understand the situation and give an informed consent.

The trial court also concluded that the O.s did not present clear and convincing evidence that adoption by the W.s was not in E.S.'s best interest, so as to overcome the weighty consideration that the trial court gave to K.S.'s choice of the W.s as E.S.'s caregivers. After consideration of the three relevant termination of parental rights ("TPR") factors under D.C. Code § 16-2353, the trial court found that the W.s were fit and able to provide a home for E.S., and that adoption by the W.s was in E.S.'s best interest. Accordingly, the trial court dismissed the O.s' petition, granted the W.s' petition, and ordered that E.S. be placed with the W.s. On March 11, 2016, the trial court issued a final decree of adoption to the W.s.

The O.s and the GAL filed motions for review of Magistrate Judge Arthur's decision, and on August 26, 2016, the reviewing court (Associate Judge Puig-Lugo) affirmed. Relevant to this appeal, the court concluded that K.S. had the mental capacity to consent to E.S.'s adoption, that her consent was not based on a material mistake of fact, and that the magistrate judge was required as a matter of law to invoke the weighty consideration doctrine. Judge Puig-Lugo found no error in the magistrate judge's conclusion that the evidence did not meet the clear and convincing standard to support a waiver of K.S.'s parental consent to adoption by the W.s. Judge Puig-Lugo also found no error in the magistrate judge's conclusion that the W.s were fit to adopt E.S. and that the adoption was in E.S.'s best interest.

Finally, Judge Puig-Lugo found no abuse of discretion in the magistrate judge's consideration of the expert and lay witness testimony, and the credibility determinations he made about these witnesses. This appeal followed.

## II. Discussion

"We review a trial court's order granting an adoption for abuse of discretion[.]" *In re T.J., supra*, 666 A.2d at 10. In our review, we must "determine whether the trial court exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factor." *Id*. (citation and internal quotation marks omitted). "We [then] assess whether the trial court applied the correct standard of proof . . . [and] evaluate whether the trial court's decision is supported by substantial reasoning drawn from a firm factual foundation in the record." *Id*. (citations and internal quotation marks omitted).

**Fitness Requirement**

Given the presumption that a child's best interests are served by placement with their natural parents, prior to terminating parental rights, the court must find that the natural parents are not "fit" to parent their child. *In re Ta.L.*, 149 A.3d

1060, 1083 (D.C. 2016) (en banc). "Fitness refers to the parent's intention and ability over time to provide for a child's wellbeing and meet the child's needs[,]" with the "basic inquiry" focusing on "whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare." *Id.* at 1082. (citations and internal quotation marks omitted). Fitness must be determined in reference to the specific child at issue, taking account of any special needs or extenuating circumstances— "[a]n individual may be a fit parent for one child but not for another." *In re L.W.*, 613 A.2d 350, 360 n.24 (D.C. 1992). Once the court is satisfied by clear and convincing evidence that a parent is not fit to parent their child, this presumption in favor of the natural parents "gives way to what is in the child's best interest." *In re Ta.L., supra*, 149 A.3d at 1083; *In re C.A.B.*, 4 A.3d 890, 899 (D.C. 2010) ("[I]t is the child's best interest, not the fundamental right to parent, that is paramount in adoption cases.").

**Weighty Consideration and Competence**

Pursuant to D.C. Code § 16-304 (a)-(b), generally, the consent of the biological parents is required in order for the trial court to grant a petition to adopt a child. Even though a parent may not be fit to parent his or her child, he or she may still be entitled to deference in designating a preferred caregiver "so that their

children can be raised by someone with whom they have close familial ties." *In re Ta.L., supra*, 149 A.3d at 1084. When a parent unequivocally consents to adoption of his or her child by a preferred custodian, "unless it is established that the parent is not *competent* to make such a decision . . . a parent's choice of a fit custodian for the child must be given weighty consideration . . . ." *In re T.J., supra*, 666 A.2d at 11 (emphasis added).

We have never explicitly stated the standard for competency as it applies to a biological parent's choice of a preferred caregiver. The trial court cited to *Butler v. Harrison*, a case involving an individual's competency to execute a property deed, for the proposition that an individual is competent to enter into an agreement if the person "possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the particular transaction in which [he or] she is engaged." 578 A.2d 1098, 1100 (D.C. 1990). In this case, however, we conclude that an individual's designation of a preferred caregiver for their child requires a more nuanced competency evaluation than one would apply to the determination of whether an individual could enter a legal contract given the import of the parent's designation on the best interest of the child. One of our seminal cases on the weighty consideration doctrine, *In re T.J.*, refers to the need for a parent to be "competent to make *such* a decision," indicating that competency

must be considered within the framework of an adoption proceeding. 666 A.2d at 11 (emphasis added); *see also Hernandez v. Banks*, 65 A.3d 59, 71 (D.C. 2013) (en banc) (stating that a person's ability to contract depends "on the nature of the particular transaction at issue").

We also recognize that competence is a lower standard than fitness; an individual may be competent to designate a preferred caregiver yet unfit to parent their child. Parents have "the right to raise the[ir] child if physically or mentally able to do so, or, if not, the right to determine who should raise the child." *In re T.J., supra*, 666 A.2d at 15 (emphasis added).

We look to prior cases to inform our definition of competency within the context of an individual's capacity to consent in an adoption proceeding. *In re T.J.* suggests that competency as it relates to a biological parent's choice of preferred caregiver, should be determined by evaluating both (1) whether the parent can determine what is in the child's best interest and select a caregiver accordingly, and (2) whether the parent is capable of planning for their child's future. *In re T.J., supra*, 666 A.2d at 10, 16. The first part of this standard comes from language in which we equated the parent's exercise of their right to designate a caregiver with the parent's "determination of what is in their child's best interest." *Id.* at 16; *see*

*also In re J.D.W.*, 711 A.2d 826, 833 (D.C. 1998) (holding that a mother's consent was not entitled to weighty consideration when the mother was "addicted to drugs, refusing treatment, depressed, and without a stable home" and "gave little or no thought to the best interests of her son"). The second part of this competency standard is derived from language equating competence with an ability to plan for a child's future. We noted that the trial record for *In re T.J.* contained considerable undisputed evidence that the biological mother was not "mentally incompetent to plan for her child's future" and "always ensured that someone would provide for the child's needs when she believed she was unable to do so herself." *In re T.J., supra*, 666 A.2d at 10, 14. We recognized that the biological mother's actions demonstrated forethought to ensure her child was properly cared for, that "she ha[d] not been adjudicated as a mother who failed, voluntarily, to provide proper parental care," and that she was capable "of making decisions about her son's future." *Id.* at 10.

We note that the question of competency is a legal determination. *See United States v. Makris*, 535 F.2d 899, 908 (5th Cir. 1976) ("[T]he determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his

attorney and able to rationally and factually comprehend the proceedings."). In examining the trial court record at issue in this case, we conclude that the trial court erred in its legal determination that K.S. was competent to consent to a preferred caregiver.

### A. K.S. could not make a determination about what was in her child's best interest, and was not competent to consent to a preferred caregiver.

K.S. could not make a determination about what was in her child's best interest as she was unable to retain relevant information that would factor into an informed decision. Dr. Cummings testified extensively about the many psychiatric issues that K.S. faced, including a permanent traumatic brain injury, depression, mood regulation issues, attention deficient disorder, substance abuse, mania and psychosis, and self-injurious behavior. Although Dr. Cummings was not treating K.S. on September 27, 2013, when she consented to the W.s' adoption of E.S., he treated K.S. extensively for a six-week period and concluded that K.S. likely did not have the capacity to consent. The medical opinion that K.S. likely lacked the capacity to consent was also supported by the confusion K.S. exhibited in her limited interactions with Ms. Ambroso, K.S.'s subsequent statements to her sister,

J.E., and K.S.'s representation to her attorney, Mr. Nair, that she was confused as to whom she had consented to adopt E.S.

The trial court credited the social worker, Ms. Ambroso's, testimony that K.S. did not exhibit any mental health symptoms that would lead to questions as to K.S.'s ability to give an informed consent, even though Ms. Ambroso's testimony also established that K.S., an individual with a long history of psychiatric issues, could not retain critical information over the course of a few hours. On September 27, 2013, the day of the Fair Hearing, K.S. expressed confusion both in the morning and afternoon regarding E.S.'s placement. Ms. Ambroso also had to explain in a simplified manner E.S.'s living arrangements because she "wanted [K.S.] to understand it to the best of her ability" thus suggesting Ms. Ambroso had reservations about K.S.'s capacity. K.S.'s inability to retain simple information over a short timespan or understand a scheduling arrangement is a strong indicator that she does not have the capacity to understand the nature, extent, and character of placing her child with one adoptive family over another. Further, Ms. Ambroso testified that she was not sure to what extent K.S. understood the purpose of the Fair Hearing, and acknowledged that K.S. was subject to a high level of stress. K.S.'s subsequent statements to her sister, J.E., and her representation to her attorney, Mr. Nair, that she was confused as to whom she had consented to adopt

E.S. provides further support for the conclusion that K.S. easily conflated relevant information and therefore, lacked the capacity to make a determination about what was in her child's best interest. K.S. told Mr. Nair that she believed E.S. "was staying with B.S.W. and S.E.W. when she consented" to the adoption, thus demonstrating the same confusion she repeatedly expressed to Ms. Ambroso on September 27, 2013. Given her repeated confusion, K.S.'s exercise of her right to designate a caregiver did not reflect a determination of what was in her child's best interest. In addition, even if we disregard inconsistencies in Ms. Ambroso's testimony and accept her testimony that K.S. consented to the W.s because she liked their personalities, such reasoning would not reflect an understanding of the consequences of placing E.S. with one adoptive family over another and therefore making a determination in the best interest of her child E.S.

Additionally, K.S. lacked sufficient information to make an informed decision about what was in E.S.'s best interest. Consent must be voluntary and made with a full understanding of the consequences of the decision. *See J.M.A.L. v. Lutheran Social Servs., Inc.*, 418 A.2d 133, 136 (D.C. 1980). K.S. had very minimal interaction with both families. The trial court recognized that "[s]ince the inception of the neglect case, K.S. had little to no contact with E.S, E.S.'s social workers, the O.s or the W.s." On the day of the Fair Hearing, K.S. was also

limited to fifteen minutes with each family and was not provided with any of the social worker's assessments or home studies, nor did she have the opportunity to meet with Mr. W.[21] This was also K.S.'s first meeting with the O.s, and she had no opportunity to observe them engage with E.S. Without all the relevant information about these two families, K.S. could not make a determination as to their fitness to provide adequate care for E.S. As such, any designation that K.S. made did not reflect an informed analysis of E.S.'s best interest.

K.S. also lacked the ability to plan for her child's future. The trial court's neglect finding noted that K.S. had little to no contact with E.S. since her discharge, and that K.S had not made any efforts to inquire about E.S.'s well-being, or provide any information about possible placement resources for E.S. The trial court noted that K.S. had not made any "efforts to have someone else care" for E.S. during the time she was hospitalized. Further, the record demonstrates that K.S.'s attendance at the Fair Hearing was only prompted by CFSA's outreach— K.S. did not make an independent effort to reach out to the social workers in her case, and her attendance at the Fair Hearing was only procured after her friend, Mr. Coefed, had purchased her a bus ticket and brought her down himself. K.S.'s

---

[21] K.S.'s attorney stated that he did not inform himself or K.S. about the contents of the W.s' homestudy because he believed this information was hearsay.

participation in this matter was not a result of independent forethought, and her behavior did not reflect initiative on behalf of E.S.

We note that this case is easily distinguishable from *In re T.J.*, where the child lived with the mother until he was nineteen months old, at which time the mother requested a placement for her son because she was concerned that her mental health issues could prevent her from providing appropriate care. *In re T.J., supra*, 666 A.2d at 5-6. Although the trial court adjudicated the son neglected because of his mother's mental illness, the trial court specifically rejected a neglect finding that the son was without the "proper care or control, subsistence, education . . . or other care or control necessary for his physical, mental, or emotional health." *Id.* at 4. The mother also visited her son regularly, and designated a strong and loving family member who had significant experience raising her own child, as the preferred custodian for her son. *Id.* at 6, 10. Despite the mother's mental condition, we recognized that the mother "ha[d] the capacity to designate a suitable and willing custodian and ha[d] done so." *Id.* at 11.

In this case, the trial court adjudicated E.S. neglected because of K.S.'s mental illness *and* because E.S. was "without proper parental care or control." K.S. did not make any attempts to secure appropriate care for E.S. or communicate

with the social workers involved in her case, other than to cancel visits with E.S. She did not demonstrate independent efforts to be involved in E.S.'s life, and did not have significant contact with either of the potential adoptive families. Here, there was also ample evidence that K.S., who repeatedly expressed confusion about E.S.'s placement and had difficulty retaining information, was not competent to designate a future caregiver.

**B. The trial court's legal conclusion that K.S. was competent does not comport with the factual record.**

We note that the trial court's legal conclusion that K.S. was competent does not flow rationally from the facts. The trial court credited Dr. Cummings's expert testimony that K.S. "would need constant medication to remain psychiatrically stable" and that "any assessment on whether K.S. had the capacity to make decisions, enter contracts, and consent to an adoption would have to involve an assessment of whether she was receiving mental treatment." The trial court then concluded that "no credible evidence was presented to suggest that K.S. was not receiving mental health treatment at the time she executed the consent or deemed mentally committed." The trial court further stated that "Dr. Cummings did not treat, nor was [he] aware of, K.S.'s mental health treatment in September 2013 [when she executed her consent]." The trial court's conclusion that K.S. was

receiving mental health treatment at the time she executed her consent is not substantiated by the record. There was evidence to the contrary that K.S. was not receiving mental health treatment at the time she executed the consent for the W.s to adopt E.S. Ms. Ambroso testified that K.S. had informed her on September 27, 2013, that she was not on medication because she was pregnant. Ms. Ambroso further testified that K.S.'s friend, Mr. Coefed, had also told her that K.S. was not on medication nor was she receiving mental health care around the time she came to D.C. on September 27th. As an assessment of K.S.'s capacity was predicated on her mental health treatment, the conclusion that could reasonably be drawn from the evidence was that K.S. did not have the capacity and was not competent to designate a preferred caregiver.[22]

In its February 29, 2016 order, the trial court also wrote that "[t]he words of the consent speak for themselves," and that "the various statements attributed to K.S. as they relate to who she believed she consented to does not outweigh her validly executed consent." This conclusion is problematic in light of Ms.

---

[22] The trial court also stated that Dr. Cummings "testified that at the time of her discharge K.S. had the capacity to make her own legal and medical decisions." This was a misrepresentation of Dr. Cummings's testimony, as he clearly explained that K.S. had "minimal capacity" at discharge and that he would always be concerned about her decision-making with regard to a serious decision.

Ambroso's testimony that she gave K.S. simplified descriptions of the various court proceedings because "[t]erms like petitions, permanency hearing, fair hearing, those things wouldn't mean anything to her." The actual language of the executed consent contains the type of legal language that, per Ms. Ambroso's testimony, K.S. would not understand, thus providing an impetus for the trial court to look outside "[t]he words of the consent" to ascertain whether K.S. had the capacity to execute the consent. *See Wheeler v. Howard*, 87 S.E.2d 377, 378 (Ga. 1955) (asking that "[i]f the signed written consent is all the law requires, then why the concern about the reason for giving it?").

The trial court further concluded that K.S.'s consent to E.S.'s adoption by the W.s was unequivocal, leaving no doubt. K.S. made statements to her sister, to the O.s, and to her attorney demonstrating that her consent was based on a mistaken belief that E.S. had been residing with the W.s since birth. The trial court declined to give weight to these statements, finding that K.S. would need to appear in court to testify in person, despite her long psychiatric history and the fact that she lived in New York.[23] Under these circumstances where K.S. was under stress,

---

[23] "The Court cannot credit these statements without any insights as to under what circumstances the statements were made, and to assess each (continued . . .)

required simplified explanations, and demonstrated repeated confusion, her consent cannot be deemed unequivocal. *See Fulton v. Schneider*, 202 S.E.2d 706, 707 (Ga. Ct. App. 1973) (affirming a trial court decision denying an adoption, upon finding that the biological mother had signed the consent at a time when she was subject to great mental and physical stress, and that she had not acted "with the settled purpose and volition necessary to constitute unequivocal consent").

Finally, the trial court stated that "[w]hile earlier Court of Appeals' decisions appeared to limit the circumstances under which the trial court must give the parental preference weighty consideration, exempting cases in which "it is established that the parent is not competent to make such a decision . . . subsequent holdings have rejected such approach." However, *In re Ta.L.* states the rule that if a biological parent is not competent to make a decision about a caregiver for their child, their decision is not entitled to weighty consideration. *In re Ta.L., supra*, 149 A.3d at 1084 n.34. *In re Ta.L.* clearly contemplates this need to consider K.S.'s competency.

---

(. . . continued)
statement's reliability. The Court firmly believes that the only person to express her opinion or put forth the position or explain her rationale is K.S."

**C. K.S. was not competent to designate a preferred caregiver, therefore the weighty consideration doctrine should not have applied.**

K.S. was not competent to designate a preferred caregiver, and therefore her executed consent in favor of the W.s was not entitled to weighty consideration. In accepting K.S.'s consent, the trial court ultimately applied an incorrect legal standard, requiring the O.s to prove by clear and convincing evidence that placement of E.S. with the W.s was clearly contrary to her best interest. Rather, since K.S. was not competent to designate a preferred caregiver, the test or standard was which placement would have been in E.S.'s best interest, by a preponderance of the evidence.

Finally, we note that CFSA chose to support the W.s' adoption petition prior to any input from the biological mother. K.S. did not know the W.s, and the maternal grandmother's connection to the W.s was tenuous at best. The weighty consideration doctrine only applies to the wishes of the biological parents. Although we recognize that CFSA wanted to include the maternal grandmother in the placement process, their rationale for supporting the W.s from the infancy of this case is not rooted in the law.

### III. Conclusion

In sum, in this case the mother's choice of preferred caregiver was not entitled to weighty consideration because the mother was not competent to make this designation. A parent's designation of a preferred caregiver for their child requires a determination as to whether the parent is competent to make such a decision; competence within the context of an adoption proceeding requires an evaluation of both (1) whether the parent can determine what is in the child's best interest and select a caregiver accordingly, and (2) whether the parent is capable of planning for their child's future. *In re T.J., supra*, 666 A.2d at 10, 16. In this case, there was considerable evidence that K.S. could do neither.

Accordingly, we vacate the trial court's February 29, 2016 order dismissing the O.s' petition and granting the W.s' petition to adopt E.S. If the O.s still wish to adopt E.S., both the O.s and the W.s shall file updated adoption petitions with the trial court for consideration on an expedited basis. The trial court shall reevaluate the O.s' and the W.s' renewed adoption petitions based solely on the best interest of the minor child under the TPR factors under D.C. Code § 16-2353, while also considering any changes in the circumstances since E.S.'s placement with the

W.s.[24] If the O.s no longer wish to pursue E.S.'s adoption, the trial court shall enter new findings of fact and conclusions of law that consider only the W.s' petition.

*So ordered.*

GLICKMAN, *Associate Judge*, concurring in the judgment: The sad facts of this case illustrate the fundamental defects of our unique, judicially-created "weighty consideration" doctrine. I and other judges previously have highlighted the need to reconsider this doctrine, *see, e.g.*, *In re Ta.L.*, 149 A.3d 1060, 1118-20 (D.C. 2016) (en banc) (Glickman, J., concurring and dissenting), and the en banc court soon may do so in *In re J.B.S. & V.S.S.*, Nos. 16-FS-1244 & 16-FS-1245, *en banc hearing granted* (D.C. Dec. 22, 2016). The "weighty consideration" doctrine requires the trial judge in a contested adoption proceeding to defer to an unfit natural parent's choice of adoption petitioner, unless the parent is incompetent, as long as her choice is not shown to be "*clearly contrary* to the child's best interest."

---

[24] In considering any new evidence since E.S.'s placement with the W.'s for the past two years, the trial court, in the exercise of its discretion, may consider any relevant information that addresses the best interest of the child, including attachment studies, home studies, change in circumstances, among other relevant considerations. In the exercise of its discretion, we ask the trial court to explain its decision-making when considering any new evidence.

*In re K.D.*, 26 A.3d 772, 778 (D.C. 2011) (emphasis added, quotation marks omitted).   The judge must accord such deference "no matter how ill-informed, unconcerned, or prejudiced the parent is about the child's needs and the adoption petitioners' capabilities."  *Ta.L.*, 149 A.3d at 1119.  This is incompatible with our adoption statute, which requires the judge to be satisfied that "the adoption will be *for* the best interests of the prospective adoptee."  D.C. Code § 16-309 (b) (2012 Repl.) (emphasis added).  In my view, the "weighty consideration" doctrine lacks any sound justification and is too inherently flawed to be salvaged by burdening contested adoption proceedings with threshold disputes over the "competency" of the natural parents; competent or not, their wishes should be given only the weight the judge finds they actually deserve.  Accordingly, although I do not disagree with my colleagues' ultimate determination that the natural mother in this case was not competent to decide her child's future and not entitled to weighty consideration, I concur only in the judgment.